CUMBERLAND DUGAN *vs.* THE MAYOR AND CITY COUNCIL OF BALTIMORE—THE MAYOR AND CITY COUNCIL OF BALTIMORE *vs.* DUGAN & M'ELDERRY.—*June*, 1833.

By the act of 1784, ch. 62, it was declared, that, &c. shall have power and authority to build and erect a market house on a parcel of ground, situate in the town of *Baltimore*, opposite *Harrison* street, beginning in *Baltimore* street and running thence S. of the width of 150 feet to *Water* street, *with the privilege of extending the same to the channel ;* and that the market house, when erected, and the ground whereon the same shall be built, with the privilege aforesaid, shall be vested in the commissioners of *Baltimore* town, and their successors. In pursuance of this power a market house was built to *Water* street. The space south of the market house to the channel was a continuous marsh, covering the width of 150 feet. D and M owned lots on the east and west of the space adjoining the same, and extending south to the waters of the harbor of *Baltimore*. In 1794 they applied to the commissioners of the town of *Baltimore* for permission to make a canal and wharf, at their own expense, in the market space, from the south side of *Pratt* street, (which was in fact the south side of their own lot) to the channel or warden's line of the basin of *Baltimore*. The canal to be 80 feet wide, and with streets on each side of the same. The canal, wharf, and streets, to be made public for the use of the inhabitants, under the laws and regulations of the Board of Commissioners; and to be relinquished up to the commissioners whenever the same, or any part thereof, might be wanted for market houses. The Commissioners granted the request, with the declaration "that the privilege of filling up the canal, and of the whole space of 150 feet wide, be fully reserved to the commissioners and their successors, for the use of the town according to the act of 1784, ch. 62—and that the canal, wharves and streets on each side of the canal, be a common highway, and free for the public use, and subject to such regulations as the commissioners and their successors shall, from time to time, establish; and that D and M extend *Pratt* street through their lots of ground on each side of Market space, and leave *Pratt* street through those lots forever as a street for the public use." Under this authority D and M opened *Pratt* street, and made fast land from *Water* street south to the channel, and built a canal or dock with the streets adjoining, as contemplated. After this, both the corporate authorities and D and M claimed to collect wharfage from vessels using the dock—and upon cross bills filed, it was held.

1. That the act of 1745, ch. 9, sec. 10, which declared "that all improvements of what kind soever, made out of the water, shall, as an encouragement to such improver be forever deemed his inheritance," did not apply to this case—That the improvement in front of the market house lot was not such a one as was justified by the act of 1745.

2. That the entire parcel of ground from *Baltimore* street to the channel, 150ᐟ feet in width, by the act of 1784, ch. 62, was vested in fee in the town Commissioners and their successors, with power to reclaim the marsh for the convenience of persons frequenting the market house.

3. That it was not the design of the commissioners to give D and M any right of property in the proposed improvement, and that they have no right to wharfage.

4. That the improvements, when made by D and M vested in the town commissioners, in the samemanner as they would have done if made by the commissioners, and that therefore, the corporation of the city of *Baltimore* had the right to collect wharfage from persons using the dock in question.

5. Over wharfage collected at private wharves, or wharves other than those owned by the town or city of *Baltimore*, or made at the ends or sides of public streets, lanes or alleys, the town or city officers have no control. Its imposition and collection is the exclusive privilege of the wharf owners. It is otherwise with wharfage collected at wharves owned by the town or city, or at the ends or sides of the streets, lanes or alleys—all these are called public wharves.

CROSS APPEAL from the Court of Chancery.

The amended bill, which was filed in 1831 by the appellant in the first case, and *Thomas M'Elderry*, since deceased, and which by agreement was received as an original, and in lieu of the first bill, filed in September, 1806, stated, that before the 10th of February, 1794, a parcel of ground situate in the then town, now city of *Baltimore*, and opposite *Harrison* street, beginning in *Baltimore* street and running thence, &c. of the width of 150 feet to *Water* street, with the privilege of.extending the same to the channel, was vested in the commissioners of *Baltimore* town and their successors, with power to hold the same for the benefit of the said town, under and by virtue of an act of Assembly of this State, of 1784, entitled "an act for establishing new markets, and building market houses in *Baltimore* town, and for the regulation of the said markets." That on or before the said 10th of February, 1794, the said *Dugan* was seized in fee of the ground now occupied by *Pratt* street, on the west side of *Market* space, and adjoining thereto, and running from the north side of the street to the water—and said *M'Elderry* was seized in like manner of the ground on the east side of the aforesaid *Market* space, and also run-

ning from the north side of said street to the water. And that the said commissioners of *Baltimore* town, and the said *Dugan* and *M'Elderry,* being so entitled respectively, to the said several parcels of ground, they the said *Dugan* and *M'Elderry,* on the 10th of February, 1794, proposed to the aforesaid commissioners to extend the *Market* space at their own expense, in the water, to the channel, upon certain terms and conditions, which, with some modifications, were accepted and agreed to by the said commissioners, as will appear by a copy of the agreement herewith exhibited. That immediately upon making this agreement they proceeded to fill up the space, and to make the canal, wharves and streets mentioned therein, and fully completed the same in the year 1795 and 1796, and that they have in all things on their part complied with said agreement, at great personal expense to them respectively. That when these improvements were commenced, the usual and common tide at the said *Market* space, flowed up to, and over *Water* street, and that they filled up and made fast land, the whole space from *Water* street to the south side of *Pratt* street, of the breadth of 150 feet, and extending into the water for the distance of 300 feet, and made canals, with wharves, and a street on each side, by means whereof an unwholesome marsh has been converted into firm ground, and become a convenient and commercial part of the city. That by virtue of the aforesaid contract, and the laws of this State, the complainants had a right to demand and receive wharfage from vessels lying at the wharves so made by them, and that such right will continue, until the right reserved by the commissioners in the contract, to fill up the said canal, and the whole space of 150 feet, shall be exercised, which has not yet been done, either by them or their successors, or by the *Mayor and City Council of Balmore.* That from the time said wharves were in a condition to be used, the complainants have exercised the right to charge wharfage, and continued to do so, during the existence of the Board of Commissioners, and for some time

after their powers were transferred to the *Mayor and City Council of Baltimore,* without hindrance or molestation. That by the act of 1796, the powers and authority which had been delegated to the Commissioners, were all transferred to, and vested in the *Mayor and City Council of Baltimore,* who sometime thereafter began to suggest doubts of the title of complainants to the aforesaid wharfages, and finally prevented them altogether from receiving the same, and took them into their own possession. *Prayer,* for an account, an injunction, and for general relief.

Exhibit A, referred to in the bill, is as follows :

"*To the Commissioners of Baltimore town,*

GENTLEMEN,—We the subscribers, request your permission for making a canal and wharf, at our expense, in the *Market* space, from the south side of *Pratt* street to the channel, or warden's line. The canal to be 80 feet wide, and the streets on each side the same to be 35 feet wide. The said canal, wharf and streets to be made public for the use of the inhabitants, under the laws and regulations of your board, and the whole of the same to be relinquished up to the commissioners whenever the same, or any part thereof, may be wanted for market houses.

CUMBERLAND DUGAN,<br>THOMAS M'ELDERRY.

*Baltimore,* 10*th February,* 1794."

"The commissioners of *Baltimore* town having considered the above application, have no objection to *Thomas McElderry* and *Cumberland Dugan* filling up the space of 150 feet wide, on a line with the present *Market* space from *Water* street, as far as a line drawn from the south side of *Pratt* street shall intersect or cross the said space, and after filling up the said space the commissioners have no objection to their making a canal from the same line of intersection to the channel, of 60 feet wide with wharves, and a street on each side of said canal of 45 feet wide, but with this express declaration, that the privilege of filling up said canal, and of the whole space of 150 feet wide, be fully re-

served to the said commissioners and their successors, for the use of said town, as granted by the act of assembly of November session, 1784, *ch.* 62, entitled an act for establishing new markets, &c., and also on this express condition, that the said canal, wharves and streets, on each side of the said canal, be a common highway, and free for the public use, and subject to such regulations as the commissioners and their successors shall, from time to time, establish; and on this further express condition, that the said *Dugan* and *M'Elderry* extend *Pratt* street through their two lots of ground on each side of *Market* space, and leave *Pratt* street of the width of 60 feet through their said lots forever, as a street for the public use."

The answer of the *Mayor and City Council of Baltimore* admits the preceding to be a true copy of the application to, and agreement between, the complainants and the commissioners of *Baltimore* town, and insists that under the same, and in virtue of the laws of this State, they are entitled to receive the wharfages which have, and may be received for the use of the wharves, at the head and sides of the canals, made as aforesaid by the complainants, they, the defendants being the sole owners of said wharves, and of the ground whereon they are erected. That by an ordinance, passed in 1801, it was enacted, that all monies, arising to the city from wharfages, be specially appropriated to the improvement and cleaning out of the particular wharves and docks, from which the same was collected, that the said ordinance has been duly carried into effect, and continued in force when the present bill was filed. That the Mayor, in virtue of said ordinance, appointed the complainants commissioners to execute the same in reference to the wharves mentioned in their bill, and that they accepted the appointment, and continued to execute the powers thereby conferred on them until the time of its exhibition. That the defendants now have a right to all the ground on the south side of *Baltimore* street, and running south parallel to *Gay* street,

for the width of 150 feet to *Water* street, with the right to extend the same to the channel of the basin of *Baltimore*, and that the commissioners erected a market house on the said piece of ground for the use and benefit of the inhabitants, which is now standing.

The bill of the *Mayor and City Council of Baltimore* against *Cumberland Dugan*, which was filed on the 1st of March, 1830, after alleging the facts contained in the aforegoing bill and answer, and asserting the right to be in the complainants in this case, proceeds to state, that *Dugan* had received a considerable amount of wharfages, of which it prays an account, that a receiver may be appointed to receive and hold those thereafter to accrue, pending the controversy, and for an injunction, all of which was granted by the chancellor.

*Dugan* answered this bill, affirming the right to be in him.

The two cases were set down for final hearing together, and argued at the same time before the chancellor.

BLAND, Chancellor, on the 13th June, 1831.

These cases standing ready for hearing, and the solicitors of the parties having been heard, they were by consent, permitted to stand over, with leave to amend the pleadings, and the amendment having been made, they were submitted on the 4th inst. and the proceedings read and considered. Upon the whole, I am of opinion that the wharves in the proceedings mentioned, are public wharves, no more liable to wharfage, than any one of the streets of the city are liable to toll. That these wharves, like the streets, are to be regulated and kept in repair at the expense of the city alone, and that for the purpose of protecting the rights and interests of the public, each of these parties must be prohibited from collecting wharfage or toll of any description for the use of these wharves.

The chancellor thereupon ordered the cases to be consolidated, and prohibited and enjoined both parties from re-

ceiving any wharfage or toll for the use of the wharves in question.

From this decree *Dugan* and the *City* prayed an appeal to this court.

The cause was argued before Buchanan, Ch. J., Archer and Dorsey, J.

*Gill,* for *Dugan* contended,

1. That he is to be considered as an improver, under the act of 1745, *ch.* 9, *sec.* 10, and entitled to an estate in fee in the wharf in question, of a qualified character; and though made without authority, it was not the design of the legislature, that the port wardens should destroy such improvements, without a previous judicial investigation, nor could they exercise such a power, under the act of 1783, *ch.* 24, *sec.* 9, consistently with the 18th section of the bill of rights. The mode of proceeding to procure a demolition of the improvement, is designated by the statute, and must be pursued. *Cox's Dig.* 639, 646. 2 *Cranch,* 358, 386. 3 *Cranch,* 338.

2. That the qualification annexed to the estate in *Dugan,* is the right of the corporation of *Baltimore* to extend the marsh market and market house to the channel. That is the only right which the corporation is at liberty to exercise. It can take the property and interrupt the right of *Dugan* for that, but for no other purpose. 1784, *ch.* 62. This right in the city is a mere incorporeal hereditament, and not a legal right to the soil, until it is taken and used for the purposes of the legislative grant. *Canal vs. Rail Road Co.* 4 *Gill and Johns.* 1. It is a right which the commissioners had no power, either to transfer or trammel by contract or agreement, and consequently the arrangement between them and *Dugan* and *McElderry* in 1794, is a mere nullity and void.

3. That until the corporation does require the property in question for a market, *Dugan* has a right to wharfage, as a compensation for his improvement, as far as the public

think proper to use the wharf, and this under the act of 1745, *ch.* 9, *sec.* 10.

4. That if upon the construction of the agreement between *Dugan* and the commissioners, *Dugan* had no right to wharfage, neither has the corporation of *Baltimore.*

5. By the act of 1784, *ch.* 62, *sec.* 1, certain persons were authorised to build and erect a market house on a parcel of ground, beginning on *Baltimore* street, and running south of the width of 150 feet to *Water* street, with the privilege of extending the same to the channel. ·The market house when erected—the ground whereon the same shall be built, and the privilege aforesaid is vested in the town commissioners. What is the true construction of this act? What estate does it give the commissioners? The legislature designed the market house presently intended to be built, should stop at *Water* street. The house thereafter to be erected might exterd to the channel—Hence, it vested a present estate in the house and the *ground whereon the same shall be built,* in the commissioners. It gave them no more estate. Then the privilege is introduced. That gives a right in future, when the privilege should come to be exercised. Its nature would carry the right to reclaim the marsh, and make fast land to the channel. The exercise of the privilege must carry the fee. But still, this is but a privilege, and no immediate estate in the soil. In the mean time it was subject to the act of 1745. It was not intended that this noxious marsh should not be reclaimed by the adjacent proprietors, as in other cases, reserving the public right whenever the trade, extent of population, or judgment of the town authorities should make it necessary to extend the market house. That time has not arrived; and hence, the improvers, who have conferred a great benefit upon the public at large, out of their private fortunes, ought to have the incidental advantage of wharfage. The court can only regard the privilege created by the act of 1784, as a limitation upon the right which the improvers, as water lot proprietors have, under the act of 1745. Their

estate to continue valid until the privilege comes to be exercised; and this view does justice to all. If these views are erroneous then there is no equity, looking to the letter and spirit of the permission of 1794, in giving the city of *Baltimore* wharfage, while it is refused to the proprietors. The word *"free,"* in the permission, means free to all, and free for all purposes. Common highways are not burthened with tolls, except where the law enacting them, expressly so declares, which is not the case here.

*Belt* and *Johnson*, for the *Mayor and City Council of Baltimore.*

The bill of 1831 is alone to be regarded, and that bill asserts no right under the act of 1745. It refers, for the rights of *Dugan* and *McElderry*, exclusively to the agreement of 1794. There can, therefore, be no necessity for inquiring into rights which may have been acquired under the act of 1745, though none such as is asserted on the other side, could have been so acquired; because the act of 1784, *ch.* 62, vested the right to improve the property in question, in the city commissioners. After the passage of the act of 1784, it is impossible that *Dugan* and *M'Elderry* could be authorised to make these improvements, without the consent of the commissioners, as the whole power was conferred on them by that act. The case therefore depends on the agreement of 1794—act of 1762, *ch.* 34. All the rights and powers of the commissioners were by the act of 1796, *ch.* 68, transferred to the present corporation of *Baltimore.* By the answer of the commissioners to the application of *Dugan* and *M'Elderry* in 1794, all the rights of the former, under the act of 1784, are reserved. If *Dugan* has a right to charge wharfage, he has an equal right to charge tolls for navigating the canal, and from passengers on the streets. The terms of the act are the same with respect to each. By the permission granted by the commissioners, the wharf, &c. is to be *free* for the public use, and yet if the right claimed exists, the charges may be so ex-

travagant as to preclude the public altogether from the use of them.   If the act of 1745 gives *Dugan* the right demanded, then as that act in relation to the subjects to which it applies, gives a fee in the property improved, he might have appropriated the whole to himself as private property.   There can be no doubt that the improvement was made under the agreement, or permission of 1794, the only construction of which is, that the wharves, &c. thereby authorised to be made, should be for the public use, free of expense.

On the appeal of the city they contended that the act of 1784 expressly gives to the commissioners the privilege of extending the 150 feet front to the channel, and not merely to extend the market house, and the ground when extended, vested in the commissioners, to be applied by them to any purpose they might think proper, for the advantage of the town of *Baltimore.*   And the rights conferred by the act of 1784, never have been attempted to be impaired by subsequent legislation.   It will not do for *Dugan* to say that the wharf is free under the permit of 1794, because he is now himself asserting the right to exact wharfage for his own emolument.   By the permit, *Dugan* was only to make the improvements.   He was under no obligation to keep them in repair.   This the city is bound to do, and it would be strange if they are not entitled to the profits, out of which they might do so.   These profits are the appropriate fund for defraying the expense—act of 1783, *ch.* 24. And in point of fact, the funds thus derived, have been so applied by the city.   *Ord.* 24*th April,* 1797—19*th March,* 1798—21*st March,* 1801.

The true construction of the agreement of 1794 is, that as to *Dugan,* the wharf was to be free, but as, under the reservation, it was to be subject to such regulations, as the commissioners should prescribe, the right of the city to charge wharfage was not impaired.   The right to regulate carried with it the right to collect wharfage, as a necessary part of the power reserved.   There can be no doubt, that

when the wharf was completed, the fee was in the commissioners; they having the right to resume it, when, and for any purpose they pleased; and of course they could resume it for the purpose of charging wharfage. The agreement of 1794 dedicates the wharf, when made, to the public. *Dugan*, as an individual, can claim no right under that agreement. The public by the contract is the grantee, and it might of course, impose any incumbrance it thought fit upon its own rights, and the right of the corporation is admitted by the act of 1813, *ch.* 118. By this act the *past* right of the city is conceded, and the act only denies, the right for the future; and the law being found injurious was repealed by the act of 1827, *ch.* 162, which expressly confers upon the city the right to charge wharfage for the future. The *ordinance* of 27th February, 1826, authorised the *Mayor and City Council* to collect wharfage on this identical wharf, and this ordinance was in force when the act of 1827 was passed.

Dorsey, J., delivered the opinion of the court.

The appeal of *Dugan* and *M'Elderry* against the *Mayor and City Council of Baltimore*, will first be considered. The right of the appellants to collect the wharfage in question, has in the argument, been asserted to arise under the act of assembly of 1745, *ch.* 9, *sec.* 10; which, in reference to the town, now city of *Baltimore*, declares "that all improvements, of what kind soever, either wharves, houses, or other buildings, that have, or shall be made out of the water, or where it usually flows, shall, as an encouragement to such improvers, be forever deemed the right, title, and inheritance of such improvers, their heirs and assigns forever." But this act of assembly gives no support to the claims, in aid of which it has been invoked. The improvement made by *Dugan* and *M'Elderry*, in front of the market house lot, is not such an improvement as is justified by that act of assembly. So to construe it, would be to give it a literal, not a sound, or rational interpretation. The im-

provements authorised and encouraged were those made
by improvers in front of their own lots, not of their neigh-
bors.   The legislature never designed such invasion of the
rights of private property; nor indeed had they the power
to legalize it, if such had been their intention.   But if this
act of assembly could have sustained the appellant, he has
waived all claim to relief under it, by withdrawing his
first bill of complaint, and filing his third as a substitute
therefor.   His title to wharfage, if it existed at all, is de-
rived from the permission for his improvement, granted in
1794, by the commissioners of *Baltimore* town.   This per-
mission, or contract, if it may be so called, is, it has been
insisted, on the part of the appellants, a nullity, and dis-
charged of all obligation as respects *Dugan;* because the
town commissioners having, under the act of 1784, *ch.* 62,
no power to extend their grounds but in the extension of
the market house, could confer no such authority as that
which had been exerted by *Dugan* and *M'Elderry.*   This
assertion is in direct contradiction to the positive allegations
contained in their bills.   To ascertain its correctness, how-
ever, it becomes necessary to examine into the nature and
extent of the interest of the town commissioners in the mar-
ket house property, and the "privilege" of extension there-
with conferred.   If, as is alleged, this "privilege" was no-
thing more than the extending the market house to the
channel of the basin, it is evident that *Dugan* and *M'El-
derry* derived from the commissioners no such authority as
that which has been exercised under the permission.

The solution of this inquiry depends entirely on the
true construction of the second section of the act of 1784;
which enacts that *Samuel Smith* and others, "shall have full
power and authority by this act, to build and erect a mar-
ket house on a parcel of ground, situate'in the said town,
opposite *Harrison* street, beginning on *Baltimore* street,
and running thence south, parrellel with *Gay* street, of the
width of one hundred and fifty feet, to *Water* street, with
the privilege of extending the same to the channel; and

that the said market house, when erected, and the ground whereon the same shall be built, with the privilege aforesaid, shall be, and is hereby declared to be vested in the said commissioners of *Baltimore* town and their successors forever, from and immediately after the said market house shall be built and erected; to hold, possess, and enjoy the same market house, ground and privilege aforesaid, to and for the use and benefit of the said town, in as full and ample manner as if the said commissioners had been legally constituted a body politic and corporate, in deed and in name; provided always, that the said *Samuel Smith* and others, shall erect and build the said market house in a good substantial workman-like manner, according to such plan and dimensions as the commissioners of *Baltimore* town shall approve, on or before the first day of March, in the year one thousand seven hundred and eighty-seven." What vested in the *commissioners of Baltimore town*, under this legislative provision, is the question to be determined?

That the market house, when built, passed to them is undeniable; but what quantity of ground was transferred with it, is a matter not so self-evident. To give to this enactment a superficial examination, a literal interpretation, and it might be said, that no more ground passed to the commissioners than that which the market house built, actually occupied. But when we advert to the size of the ground, the privilege conferred as to its extension, the nature of a market house, its probable dimensions, the facilities necessary to its beneficial enjoyment, and the benevolent designs of the legislature manifested in relation thereto; it is impossible to doubt that they intended to vest in the commissioners the entire ground described. Give to their act a different exposition, and the market house is stript of its most valuable, nay, inseparable appendages; it no longer exists as of public utility. Houses might be built in immediate contact with its sides; and wagons, carts, and such other vehicles as usually attend a public market, are wholly excluded,

there being no place appropriated for their reception. Whoever saw, or heard of a market house without public avenues, or highways on its sides, for the accommodation of the public ?   That it was intended for the market house to cover the entire ground by being erected of one hundred and fifty feet in width, is an idea too absurd to be indulged for a moment; indeed, it is distinctly repudiated by the conclusion of the aforeging section of the law, which provides, that the market house shall be built of such plan and dimensions as the commissioners shall approve. If the legislature meant to convey nothing more than the ground actually covered by the market house, what motive could have prompted them to transfer the privilege, not only of extending to the channel the lot occupied by the market house, but also the water front of the lots on the east and west sides of it? Our construction of this clause of the act of assembly, in relation to the limits of the ground which was granted, is not only consistent with the spirit and objects of the law, but is in accordance with its terms and expressions. It describes the ground suitable for the purpose, authorises the erection of the market house thereon, and then grants the market house, with the ground on which it is built. On what ground was it built?  On that ground which was described and appropriated for that purpose.  The entire parcel of ground clearly passed to the town commissioners.

It was contended in the argument that in the grant of the "privilege of extending the same to the channel," the relative term "same," there used, referred to the market house, and not to the ground whereon it was to be erected. If such was the design of the general assembly, it is difficult to conceive by what motives they were actuated. What? extend a market house fourteen hundred feet through the marsh, and into the water, to the very channel of the basin, and leave in contact with each side of it, such a marsh and depth of water as would preclude all possibility of approaching it, but through its northern extremity. It has been common to grant the privilge of extending lots of ground into

the basin; but it is perhaps the first time that it was ever alleged, that an authority was granted to extend houses into navigable water. There is, however, nothing to warrant this construction. According to the obvious meaning and grammatical interpretation of the sentence, the relative, "same," agrees with its more immediate antecedent "ground;" and the ground referred to, is the market house lot of one hundred and fifty feet wide. That the "privilege" thus conferred, with the ground which might be reclaimed under it, were vested in the town commissioners in fee simple, there is no room for the suggestion of a doubt. But it is insisted on in the bills of complaint, and in the argument at bar, that its use and enjoyment by the city, is exclusively limited to the erection of a market house thereon. If such was the intention of the legislature, it is impossible to collect it from their act. They have used no words of limitation, or restriction, as to the purposes to which this extension of ground was to be appropriated, nor can any be inferred from the nature of the grant, its subject matter, nor any of the circumstances attending it. On the contrary, they declared that this "privilege," shall vest in the commissioners of *Baltimore* town and their successors forever, "to, and for the use and benefit of the said town." Thus leaving the mode of its enjoyment, the purposes to which it was to be applied, to the sound discretion of those, who were created the trustees, or guardians of the interests of the town. These commissioners acting in its behalf, and for its benefit, might have improved this "privilege" themselves, by filling up from time to time, or at any time, this immense space, or any part of it; or employed, or permitted, upon such terms and conditions as to them seemed reasonable and just, other persons to do so. Under this power, and in virtue of their permission, the improvement of *Dugan* and *McElderry* has been effected. Their rights then, over the wharves and ground, extended in front of the market house lot, depend altogether upon the construction that may be given to the permission they

received from, or in other words, the contract they made with the town commissioners. Upon this subject, as far as *Dugan* and *McElderry's* claim to wharfage is concerned, we think the permission or contract under which they acted too explicit, and unambiguous, to permit us to entertain even a momentary doubt. In the wharves and canal to be constructed, the town commissioners neither gave, nor intended to give to *Dugan* and *McElderry*, any right of domain, or of property. Their attempt to charge wharfage, therefore, has no colorable pretext to support it, and is a violation of the spirit and meaning of that condition imposed by the town commissioners, which declares, "that the said canal, wharves, and streets on each side of said canal, be a common highway, and free for the public use." A distinct annunciation to *Dugan* and *McElderry*, that they had no right therein, but in common with the rest of the community. Great stress appears to be placed on the fact, that the canal and wharves were made by *Dugan* and *McElderry* at an immense expenditure of money, and that the health, and commerce of the city, have been greatly promoted by their "improvement," and we are left to infer, that all this has been done with the most patriotic public spirit, and disinterested motives; with a single eye to the public benefit;—that this effort by the corporate authorities of the city of *Baltimore* to deprive them of this wharfage, their only return for this enormous expense of money and labor, is an act of ingratitude, persecution, oppression, and injustice, which should excite the indignation and sympathies of this court.

Are these grievances complained of, well founded? Were these the considerations that induced the complainants to engage in their laborious and expensive undertaking? Is this wharfage the only remuneration they receive for their inordinate sacrifices? A slight comparison of their condition before, and after the completion of their improvement, will rectify any misapprehension on this subject, that might otherwise arise.

In 1794, *Dugan* and *McElderry* were the owners of two lots fronting on the water, and adjoining the market house, the one being on the west side of it, the other on the east. Whether the front of each of those lots was 30, 40, 50, or 100 feet on *Water* street is not shown by the record. Suppose *Dugan* and *McElderry* had extended their lots into the basin to the channel, or port wardens' line, without any additional extension under the town commissioners' privilege; how many feet of water front, or wharf property would they have been entitled to? As many feet, and no more, as their lots fronted on *Water* street. What length of wharf would they have been compelled to make to attain that object? Precisely the same length of wharf, except eight feet on *Pratt* street, which they have now made; the wharves on the sides of their lots, binding on the market house lot "privilege" being indispensable to prevent the earth, with which their lots was filled, from washing away and filling up, and destroying the navigation of the basin. Their net gain of water front, or wharf lots under the permission of the town commissioners is two thousand feet, perhaps ten times as much navigable front on the water, as they could legally have acquired, by availing themselves only of their own water rights. By this operation they have rendered their property, in all probability, at least four or five times as valuable as it would otherwise have been. And what compensation do the *Mayor and City Council of Baltimore*, (who under its charter are clothed with all the powers of the town commissioners,) receive as territorial proprietors of their "privilege;" for its enjoyment by *Dugan* and *McElderry*? According to the pretensions of the latter, not one farthing. And furthermore, agreeably to that part of the chancellor's decree, relative to the repairing of these wharves, (which is unquestionably correct,) the corporation are bound to bear the whole burden of repairs. This to be sure, would be a left handed, unilateral bargain with which it would be difficult to find a parallel. Seeing no equity in the claims of the complain-

ants, *Dugan* and *McElderry*, their several bills of complaint against the *Mayor and City Council of Baltimore* ought to be dismissed with costs, as concerns *Dugan* and *McElderry*, both in this court and in the Court of Chancery ; but without costs so far as the widow and heirs of *McElderry* are concerned ; and the injunction issued in those cases is dissolved.

Having disposed of the cases of *Dugan* and *McElderry* against the *Mayor and City Council of Baltimore;* our next duty is to examine, upon the bill filed by the latter against *Cumberland Dugan,* what right the corporation of *Baltimore* have to collect the wharfage to which, by their bill, they have made claim.   To make this examination, we must settle the true construction of the permission, by which the commissioners of *Baltimore* town authorised the "improvement" made by *Dugan* and *McElderry;* according to which we think, that no right of property or domain passed to them, in the canal, wharves, and streets constructed under the commissioners' "privilege."  But that the same, vested in the said commissioners, in the same manner, that they would have done, had the "improvement" been made by themselves ; except so far, as their powers were abridged, by that condition attached to their permission, by which it was declared that "the said canal, wharves and streets, on each side of the said canal, be a common highway, and free for the public use, and subject to such regulations as the commissioners and their successors shall from time to time establish."   If to ascertain the meaning of this stipulation, we could look to the acts of the parties from the time when their stipulation could have been brought into operation, until the present moment, it is most manifest, that neither party supposed the right of wharfage was extinguished.   Both parties admitted the existence of the right ; the only controversy was, by whom it should be exercised.   Over the wharfage collected at private wharves, or wharves other than those owned by the town or city of *Baltimore,* or made at the ends or sides of public streets,

lanes and alleys, the town or city officers have no power or control. Its imposition and collection, is the exclusive privilege of the wharf owners; with it, the officers of the town or city have no concern. It is otherwise with wharfage collected at wharves owned by the town or city, or at the ends or sides of the streets, lanes or alleys : all these are called public wharves ; are common highways, free for the use of the public ; but at which tolls were collected by the town, now city, officers.

In declaring the wharves on *Market* space, common highways, and free for the public use, the commissioners never designed to surrender their proprietary right; further than that the wharves should not be held as private wharves, under the absolute dominion of their owners ; to which no vessel can approach, or make fast without the consent of the proprietors: but that they should be "free," that is, (according to its obvious as well as literal sense,) *open* for the public use. They meant nothing more, than that the use of those wharves should be the common privilege of all ; but never intended to relinquish the natural, inherent right, incident to their title of collecting a reasonable and customary wharfage. They do not agree that it shall be a highway for the use of the public, free of wharfage, or expense ; but simply, that it should be a common highway, "free," or (to use another word of the same import,) *open* for the public use ; leaving to the proprietors of the soil, their natural, inherent right of collecting a wharfage. All our turnpike roads are common highways, and free for the public use, but not free from the collection of tolls. A wharf may be free from wharfage, and yet not a highway, or free for the public use; or it may be a highway, and free for the public use, and yet not free from wharfage.

From the nature of the permission, and circumstances attending it, granted to *Dugan* and *McElderry* by the town commissioners, ought we to infer a surrender of their rights of domain, beyond the terms of their stipulations? *Dugan* and *McElderry* acquired, what was clearly the object of

their application, an immense additional water front, and highways, or streets in front of their numerous warehouses, which they had in contemplation; and which they have told us, they subsequently built. It was no part of their application, that "the canal, wharf, and streets when made should be *free* for the public use." The only requisition, in their application was, that they should "be made public for the use of the inhabitants, under the laws and regulations of the town commissioners." Is it then rational to presume, that when it was not even asked for, these commissioners by using the word "free" where they have used it, designed to relinquish an inherent, and unquestionable right, of great value to the town, and their only direct advantage, or income resulting from the "improvement," whilst at the same time, they imposed upon *Baltimore* the new burden of keeping these wharves and streets in repair, and of furnishing at its own expense, officers to enfore such regulations as the said canal, wharf, and streets might render it necessary for them to establish? Strip them of this claim to wharfage, the essence of their right of domain, and there is no more reason, or justice in holding them bound to repair these wharves, and incur the expense of these regulations; than there would be in requiring them to repair and regulate every private wharf in the city.

Was this asserted exemption from wharfage, deemed essential or appurtenant to the warehouses; the erection of which was the great object of the improvement? The acts of *Dugan* demonstrate the contrary. He always denied its enjoyment to the occupants of the warehouses, and exercised himself the right of collection, as separate from, and independent of such occupation.

Can any thing be more reasonable and just, than this claim to wharfage? The city of *Baltimore* as proprietor is bound to cleanse the canal, and to regulate and repair those wharves and streets. The natural fund to defray the necessary expenditure of which, is what? The wharfage; an income derived from those who enjoy the benefit of this

expenditure. We cannot then by a technical strained construction of the word "free," which those who used it could not have intended it to bear, invert the natural order and fitness of things, and deprive the city of *Baltimore* as a freeholder, of its inherent rights of emolument, and at the same time impose on it all the correlative burdens.

In doing so we think the chancellor erred, and therefore reverse his decree, with costs to the appellants in this court, and in the Court of Chancery. The injunction issued against *Cumberland Dugan* should have been made perpetual, and a decree to account, passed in the usual form; for which purpose, and that the chancellor may pass such orders and decrees in the case, as are requisite to give full and final relief to the complainants, according to their equities, this cause is remanded to the Chancery Court.

DECREE REVERSED, AND CASE REMANDED TO THE
COURT OF CHANCERY FOR FURTHER PROCEEDINGS.