OWEN ET UX. *v.* HUBBARD ET UX.

[No. 137, September Term, 1970.]

*Decided December 15, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Victor H. Laws,* with whom was *Clarence H. Corkran, Jr.,* on the brief, for appellants.

No brief filed on behalf of appellees.

DIGGES, J., delivered the opinion of the Court.

The Skipjack is a commercial sailing ship indigenous to the tidal waters of the Chesapeake Bay and its tributaries. As an oyster boat it has survived in these days of marine mechanization because of legislation prohibiting power craft from dredging on oyster bars and because of its ability to draw less than six feet of water fully loaded and 3.5 feet unloaded. In spite of this low draft the appellants, William H. Owen and his wife, found it necessary to dredge a five foot channel and build a protective bulkhead in a "finger" or cove off LeCompte Creek in front of their Dorchester County home to provide a safe harbor for their skipjack and other boats. The nettle of this dispute is that they were only one of three property owners with riparian rights to the cove.

In December 1966 the Owens successfully sought a permit from the Army Corps of Engineers to dredge the proposed channel. Upon completion of the dredging they obtained a similar permit to erect a wooden bulkhead approximately 150 feet in length along two sides of the new basin. As a requirement for each permit they obtained the written consent of their two riparian neighbors, including that of the plaintiff and now appellee, the Rev. Richard C. Hubbard, who, with his wife, owned the property on one side of the cove.

The major leg of the bulkhead, about 107 feet long, runs across the Owens' frontage on the back line of the cove and is not the subject of this controversy. Under Sec. 46 of Art. 54 of the Code (1957, 1968 Repl. Vol., now superseded by Art. 66C, § 720 (1970)) as "[t]he proprietor of land bounding on any of the navigable waters of this State," Mr. Owens was "entitled to the exclusive right of making improvements into the waters in front of his said land . . . ." The controversy is over the east-west leg of the bulkhead which was placed at a virtual right angle to the north-south leg and extends for 41 feet along the left shore of the cove toward its mouth. The Hubbards own the land facing on most of this 41

foot section of the bulkhead, but with their consent, the Owens proceeded to fill in the wash area behind the bulkhead, in effect creating a snug harbor, with a two-sided loading wharf, for their skipjack. At this point the relationship between the two neighbors was amicable, for in terms of relative values the cove meant little to the Hubbards. Their home faced toward the main waters of LeCompte Creek and they freely conceded that they rarely used the cove, whose shore merely ran down the "side" of their property. The Owens' home, on the other hand, faced the cove at its far upland end, this being their only access to the navigable waters of the creek. Indeed, if this portion of the Hubbards' property bordered on the cove at all, it had been substantially improved at no expense to them but at a considerable expenditure of time and money by the Owens. Still, the inevitable boundary dispute arose.

The Hubbards' sixth course was the crucial dividing line between the two tracts. It was located shortly to the rear of the 41 foot section of the bulkhead, starting from a point on the cove and running in a southwesterly direction first across marshy shore land and then across more solid land. The Hubbards' deed describes their boundaries on the creek and part of the cove as either "along the shore" or "beside a cove," but the fifth and sixth courses were described as follows:

"(5) S. 13 degrees W. 113 feet *to a post at the head of a cove;* (6) S. 63 degrees W. 94 feet *to a cedar tree and stone . . ."* (emphasis supplied).

The Owens' deed provided that the pertinent common boundaries were:

"thence (2) running and binding with the home place of the said Agnes Hubbard, in a southward direction, to a cedar tree standing at the corner of the said Hubbard home place; thence (3) *still running and binding with the said Hubbard home place, in an eastward direction, to the wa-*

*ters of LeCompte Creek or Cove;* thence (4) running and binding with and upon the waters of the said Creek or Cove, in a southward direction to the Thompson lands;" (emphasis supplied).

In one respect both of the property owners took cognizance of the location of the sixth course, for on the far end of the 41 foot leg Owen constructed a 13 foot wing extending at a right angle into the shore for lateral support. He admits that 5 to 7 feet of this supporting structure crosses the sixth course and he admits that portions of the fill as well as supporting rods attached to sunken logs or "dead-men" are on the Hubbards' side of the line. In fact, all of these supporting structures were installed after the Hubbards gave verbal consent. What the Owens do not admit is that the part of the sixth course which was covered by the backfill was in actuality a riparian course, and that under Art. 54, Sec. 46 the fill and bulkhead accreted to the Hubbards' rather than to their land. As a dramatic demonstration of his belief that he built all of the 41 foot leg of the bulkhead on his side of the sixth course and in front of his land, Owen planted a flagpole at the intersection of the 41 foot leg and the 13 foot lateral wing. The Hubbards objected to this act of imperium and shortly brought an action seeking declaratory relief against the Owens. The Circuit Court for Dorchester County (Mace, J.) in a thorough and thoughtful opinion ruled that the Hubbards had title to that part of the bulkhead which was in front of their property, but on the basis of their written and verbal consent to the work Judge Mace granted the Owens a permanent easement for the reasonable use and enjoyment of the Hubbard section of the bulkhead. The Owens have only appealed from the determination that the bulkhead was not theirs. None of the parties has raised any question over the nature and extent of the easement and the Hubbards have neither cross-appealed nor otherwise appeared in this Court.

The Owens have raised numerous questions on appeal and we shall shortly explore these in some detail. For the purpose of clarity, however, we think they can be reduced to two basic contentions: 1) the trial court erred in fact and at law in determining that the Hubbards' sixth boundary line was a riparian course, and 2) even assuming a riparian course, it was error to permit the Hubbards' mere "side" rights to prevail over the appellants' right to use and possess any improvements they had erected in front of their home, particularly since this frontage was their only access to navigable water.

## The Existence of the Riparian Course

The appellants contend that in view of the language in the Hubbard deed they were entitled to summary judgment. This argument is grounded on our recent decision in *Stottlemyer v. Kline,* 255 Md. 635, 259 A. 2d 52 (1969), where we pointed out at page 648 that:

> "The deeds and other evidence indicate an intention of the original draftsmen to insure that the owners of the land on the north and east side of Antietam Creek *should not have any rights as a riparian owner* abutting Antietam Creek as it then flowed, in that the boundary established never did abut the creek."

The deed call in question there used this language:

> "* * * North thirty-five degrees East nineteen perches to a stone *near* the Antietam Creek, thence *with the meanderings of said creek within four feet of the water the sixteen following courses and distances . . . ."* 255 Md. at 645

On the basis of that explicit language and other evidence we affirmed the finding of a non-riparian course. Here, there is no language explicitly excluding such a course, only the omission of the riparian language used in describing some of the other boundaries, such as "along

the shore" or "beside a cove." While this omission by it-self might constitute evidence of a contrary intent, we think that it does not exclude the possibility that this course touched the water, the hallmark of riparian rights. *Stottlemyer v. Kline, supra* at 646-47.

To shore up their argument the appellants point to the language in their own deed which describes a common boundary along the Hubbards' sixth course. The necessary implication of having a common boundary, they argue, is that there must be land on both sides of it and that as a consequence they must own something on the other side of the entire sixth course. Again, this in itself suggests such a conclusion, but it does not exclude the factual possibility that when the sixth course is superimposed over the actual property in question part of it touches the water. This factual question alone was a bar to the granting of summary judgment. *Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 138, 265 A. 2d 256 (1970).

In this case after weighing all the testimony, Judge Mace found as a fact that the part of the sixth course which was in dispute, *i.e.,* that part of the line which was covered by the fill behind the bulkhead, ran through a shallow, muddy, marshy area which was completely covered by water at high tide. The mean high water line was the proper test to apply, for without re-engaging in the debate over what is the proper definition of "navigable waters,"[1] it is clear that where a body of tidal water happens to be navigable

---

1. Wagner v. City of Baltimore, 210 Md. 615, 124 A. 2d 815 (1956) and to a lesser extent Green, Tr. v. Eldridge, 230 Md. 441, 187 A. 2d 674 (1963) are the major cases discussing this debate. See, United States v. 222.0 acres of land, etc., State of Maryland (Assateague Island Opinion No. 1) 306 F. Supp. 138, 151 (1969). In particular, the Wagner case found it unnecessary to consider the abandonment of the ancient Maryland tidal-ebb-and-flow test for navigable waters for the federal navigable-in-fact test, simply because in most cases that had been before the Court the two concepts were functionally complementary to each other. The Green case merely applied Wagner to a navigable tidal stream with a marshy shore. What effect the new 1970 definition of public and

> "all of the waters between the opposite shores or banks are comprehended within the term 'navigable water' as used in Chapter 129 of the Acts of 1862 [Art. 54, §§ 45-48]." *Wagner v. City of Baltimore,* 210 Md. 615, 626, 124 A. 2d 815 (1956).

Where that shore ends and private ownership normally begins is determined by the mean high water mark, even though the area exposed by low tide might be described as "marshy." *Green, Tr. v. Eldridge,* 230 Md. 441, 446-47, 187 A. 2d 674 (1963); *Cahill v. Baltimore,* 173 Md. 450, 196 A. 305 (1938). *See also United States v. Certain Land in County of Worcester, Md.* (Assateague Island Opinion No. 2) 311 F. Supp. 1039, 1051 (1970). LeCompte Creek is a navigable stretch of tidal water whose shoreline includes the cove, which in point of fact was also navigable before it was dredged. There was, of course, conflicting evidence on the marshy nature of the shore in question, especially in regard to the tidal action over it, but once the mean high water mark was established we perceive no difficulty with the trial judge's determination that this must have been the point where the Owens' third course reached "the waters of LeCompte Creek" and the Hubbards' sixth course became a riparian one. There was also evidence, both pro and con, that a fence post some few feet behind the bulkhead was the terminus of the sixth course, a fact which would have militated against placing the boundary at the mean high water line, but Judge Mace found that this fence post stood six feet within the sixth course. We cannot say that this finding or the finding that the Hubbards' sixth course behind the bulkhead was riparian were clearly erroneous. Maryland Rule 886.

The appellants argue that we should nevertheless reverse and remand this case because the trial judge improperly viewed the premises. We do not agree. Judge

private wetlands in Art. 66C, § 719 (a) and (b) will have on this debate remains to be seen.

Mace did view the premises with neither side present, but in a supplementary opinion addressed to this very issue he stated that he obtained the oral consent of counsel for both sides to do so. Counsel for the appellants did not recall that he gave such consent. The appellants also assert that this was a highly prejudicial view since the trial judge's own observations as to the location of the markers and the bulkhead played a great part in his decision on the riparian nature of the sixth course. Although we question the possible prejudice to the appellants' case, especially since the area behind the bulkhead had been completely covered by the backfill and its riparian nature could only have been established by the witnesses' recollections rather than present observation, we think the appellants have not effectively raised this point for review. Some time after this appeal was noted they filed a petition requesting the trial judge to detail what occurred when he viewed the premises. Judge Mace immediately responded to this request and nothing more was done. To preserve the point for appeal the appellants should have requested some relief. Since no such request was made and the trial judge did everything the appellant asked him to do, there is nothing before us to consider. Rule 885; *Schiller v. Lefkowitz*, 242 Md. 461, 476, 219 A. 2d 378, *cert. denied* 385 U. S. 947 (1966); *Martin v. City of Annapolis*, 240 Md. 579, 589-90, 214 A. 2d 800 (1965). We note, however, that Judge Mace's view of the premises does not appear to have been improper. He quite strongly believed he had obtained the consent of both sides, even though the better practice would have been to let the record reflect this understanding. Moreover, the abstruseness of the boundary question involved here would suggest that anyone would need to get his bearings to adequately resolve this case. His actions were imbued with the "common sense" of which Dean Wigmore speaks in his discussion on views of the premises by the trial judge. 4 Wigmore on *Evidence*, § 1169 (3d ed. 1940 and 1970 Pocket Supp.)

The Riparian Rights on the Cove

The now superseded Art. 54, Sec. 46 provided:

"Right to make improvements in front of land on navigable river.

The proprietor of land bounding on any of the navigable waters of this State shall be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements and other accretions as above provided for shall pass to the successive owners of the land to which they are attached, as incident to their respective estates. But no such improvement shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made."

For a history of this act and its predecessors see *Mutual Chemical Co. v. Mayor and City Council,* 33 F. Supp. 881 (D. Md. 1940). The appellants claim that under the wording of this statute the improvements they have erected are "in front of" their land and hence they are entitled to complete ownership over all of the bulkhead, notwithstanding the fact that the Hubbards had a riparian course on the cove. There is no question that a bulkhead is that type of waterfront structure which constitutes an improvement under Sec. 46. It is certainly like other structures which are

"subservient to the land, and which used in connection with the land, enhance its value or enlarge its commercial or agricultural facilities, or other utility, to an extent the land alone would be incapable of, and in this way 'improve' it." *Hess v. Muir,* 65 Md. 586 (1886).

*See also Boston Molasses Co. v. Commissioner of Internal Rev.,* 155 F. 2d 45 (1946) (describing a particular bulkhead). *But see* 50 Opinions of the Attorney General 452 (Md. 1965) (restricting massive landfills under Sec. 46).

In one of our most recent expressions on conflicting riparian rights under Sec. 46, *Causey v. Gray*, 250 Md. 380, 387, 243 A. 2d 575 (1968), Judge Barnes observed that:

> "The owner of the fast land, however, has a common law right to land formed by accretion adjacent to the fast land and has the right of access to the navigable part of the river in front of his fast land, with the right to make a landing, wharf or pier in front of his fast land, subject, however, to general rules and regulations imposed by the public authorities necessary to protect the rights of the public. When the statutory law grants the right to a riparian owner to extend his lot or to improve out to the limits prescribed by the public authorities, the riparian owner receives a 'franchise—a vested right, peculiar in its nature but a *quasi* property of which the lot owner cannot be lawfully deprived without his consent.' *B. & O. R. R. Co. v. Chase*, 43 23, 36 (1875). *When the lot owner makes improvements in front of his lot, complete title then vests in him in the improvements provided it is in front of his lot and does not appropriate the riparian rights of his neighbors. B. & O. R. R. Co. v. Chase*, 43 Md. at 36-37." (Emphasis added.)

In that last sentence lies the crux of this dispute.

We have often been called upon to determine the respective rights of riparian owners whose properties adjoined each other at right angles. In those cases, except where consent or a prior patent was involved, we have stood by the "rule that adjoining owners on a concave shore must share available space for wharfing." *Cahill v. Baltimore*, 173 Md. 450, 196 A. 305 (1938); *Baltimore City v. Steamboat Co.*, 104 Md. 485, 65 A. 353 (1906); *Baltimore v. St. Agnes Hospital*, 48 Md. 419, 421 (1878); *B. & O. R. R. Co. v. Chase*, 43 Md. 23, 36-38 (1875), Tif-

fany, *Law of Real Property,* § 1228, p. 634, and 65 C.J.S., *Navigable Waters,* § 84.

The appellants acknowledge this rule but they claim that in at least two Maryland cases this Court has recognized the superior rights of fronting owners over those of mere side owners. We do not believe that either case they cite will sustain their position. *McMurray v. Baltimore,* 54 Md. 103 (1880) may have involved front and side owners on a right angled shore line, but that case decided the city's right to construct a wharf at the end of a dedicated public street although the adjoining owner might still retain the underlying fee. Similarly, in *Cahill v. Baltimore,* 173 Md. 450, 196 A. 305 (1938) side and front owners were involved, but that case was decided primarily on the issue of alleged official discrimination in denying the plaintiff the right to wharf out into navigable waters. Indeed, *Cahill* itself said:

> "What in general, or in a particular case, may constitute 'front' of land from which the Code provisions the owner may make improvements, and what, on the other hand, would be the side lines, are questions which may be reserved for further argument in another case, for it is found unnecessary to the decision of this one. *Balto. & O.R.Co. v. Chase,* 43 Md. 23, 36; *Baltimore v. Steamboat Co.,* 104 Md. 484, 498, 65 A. 353; *LaBranche's Heirs v. Montegut,* 47 La. Ann. 674, 17 So. 247; *Meier v. St. Louis,* 180 Mo. 391, 79 S. W. 955; *Carr v. Kingsbury,* 111 Cal. App. 165, 295 P. 586."

It is now time to resolve those questions, at least insofar as they relate to Sec. 46 of Art. 54.

It would normally be incumbent upon us to define the term "in front of," for the appellants make a great to-do about which direction whose house faces. We do not find this distinction relevant under this statute. It is true that some street front cases involving corner lots have had to recognize the difference between front and

side lines, *M.&C.C. v. Swinski*, 235 Md. 262, 264-5, 201 A. 2d 368 (1964) ; *Restivo v. Princeton Constr. Co.*, 223 Md. 516, 523-7, 165 A. 2d 766 (1960) ; *Wood v. Stehrer*, 119 Md. 143, 146, 86 A. 128 (1912) and *Broeder v. Sucher Bros.*, 331 Mich. 323, 49 N.W.2d 314, 316, 30 A.L.R.2d 554 (1951), but few cases involving waterfronts have ever intimated such a distinction. Some of the cases cited in *Cahill v. Baltimore, supra,* have done so, and only *Dooley v. Proctor & Gamble Mfg. Co.*, 77 Misc. 398, 137 N.Y.S. 737, 740 (1912) has explicitly given a "front" owner rights superior to a "side" owner. That case, however, was promptly reversed and remanded on other grounds in 158 App. Div. 429, 143 N.Y.S. 650, (App. Div. 1913) with the suggestion at 655 that the conflict should be resolved by apportioning the rights to the tidal flats among the owners of the adjacent uplands. In one respect the initial opinion in the *Dooley* case is instructive, for even there the front or side of the respective properties was determined by the shoreline's relationship to an off-shore bulkhead line and not by the wholly fortuitous location of the owner's front door. The subsequent opinion, by the Appellate Division, eschewed even this distinction in favor of apportionment on a concave shore. We think that the wording of Sec. 46 suggests a similar refusal to indulge in discrimination between riparian owners. That section speaks first of the owner's "land *bounding* on any of the navigable waters of this State" and then of "the waters *in front of* his said land" (emphasis added.) ,To achieve the appellants' distinction would require the statute to read: "In front of the front of the owners' said land," a semantical subtlety neither the plain meaning nor the intent of the statute will bear. We hold that in this context "front of" and "bounding" are synonymous terms and only denote that any property bounding on navigable waters of this State, whether it be by the front, side, or back line, has riparian rights. *See Rombauer v. Compton Heights Church*, 328 Mo. 1, 40 S.W.2d 545, 551 (1931). If two property owners adjoining each other on a concave shore, "elbow" or "finger" come into conflict over

their rights to extend improvements into the water they are required to apportion their respective rights or otherwise reach an agreement on how their co-equal rights should be divided. In any event, one property owner cannot completely deprive the other of his right to extend out. *Causey v. Gray*, 250 Md. at 387; *Baltimore City v. Steamboat Co.*, 104 Md. at 498; *Baltimore v. St. Agnes' Hospital*, 48 Md. at 421; *B. & O. R. R. Co. v. Chase*, 43 Md. at 36-37; and *Dugan v. Baltimore*, 5 G. & J. 357 (1883). In *Dugan* the Court considered the respective rights of riparian owners with property at right angles to each other under the Acts of 1745, Ch. 9, the predecessor statute to Art. 54, Sec. 46. This terse observation was made at 367-68:

> "The improvements authorized and encouraged were those made by improvers in front of their own lots, not of their neighbors. The Legislature never designed such invasion of the rights of private property; nor indeed had they the power to legalize it, if such had been their intention."

This same strong sentiment over legislative intent was expressed in *Councilman v. LeCompte*, 179 Md. 427, 21 A. 2d 535 (1941) which was faced with the conflicting rights of right angle owners to build a duck blind in front of their properties. Significantly the statute involved there, Code (1939), Art. 99, Sec. 47 (a) (now superseded by Art. 66C, § 154), used the terms "in front of" and "land bordering on any waters of this State." Significantly also, the property line between the two tracts had a location similar to the Hubbards' sixth course. The Court would not permit the extension of that line over the water to determine the respective rights of the parties. Judge Forsythe, speaking for the Court, said at 431:

> "But had that been done, the line would have run directly across the water front of Keester's property, with the result that Keester would have been denied his right to erect a blind in

front of his property. Clearly that was not the intention of the statute. The unmistakable purpose of the statute was to protect, and not to deprive, each land owner's right to have a duck blind."

See also Boyd v. Schaefer, 184 Md. 621, 42 A. 2d 721 (1945); Wampler v. LeCompte, 159 Md. 222, 150 A. 455 (1930) affirmed 282 U. S. 172 (1930) and Sheehy v. Thomas, 155 Md. 688, 142 A. 506 (1928).

Finally, Ockerhausen v. Tyson, 71 Conn. 31, 40 A. 1041 (1898) is, with the addition of a slightly more dramatic result, close to being a factual alter ego to this case. There the defendant owned two-thirds of the land around a bottle shaped cove, including the back line which faced out upon the river. The plaintiffs only owned the land on one side of the cove. The action arose when the defendant began to fill in the cove and wharf out over its mouth into the river. When the plaintiffs sought an injunction against this activity, he defended by asserting that their frontage was on the river and that as to the interior of the cove they had no rights superior to his. By the time the litigation was over the defendant had filled in the entire cove. The Supreme Court of Errors of Connecticut at 40 A. 1042 expressed the following opinion on the conflicting rights of the owners:

"The defendant, by filling up the flats immediately adjacent to the plaintiffs' upland, which were the subject of their riparian rights and franchise, converted the shore of the river within the cove . . . into real estate. He thus did what only the plaintiffs could lawfully do, and the land so made became an accession to their land, precisely as if they had made it. . . .

"Each had also a certain right to reclaim the flats which adjoined his premises. It was one to be exercised with due regard to the like rights held by others. Its limits were to be determined by the simple rule, 'Sic utere tuo ut alienum non

laedas.' [Use your own property in such a manner as not to injure that of another.] (Citations omitted) This unerring test of human conduct forbade the defendant, on the strength of his ownership of the land opposite to the mouth of the cove and the channel of the river, to fill out to that channel in such a way as to blot the whole cove out of existence. It also precluded his gaining title by reclamation to the shore immediately contiguous to the plaintiffs' land."

Although the principles expressed in the *Ockerhausen* case are only expositive of the common law right of a riparian owner to wharf out to deep water and not of expanded statutory rights as those in Art. 54, Sec. 46, those principles and their logic are firmly embedded in the common law of this State. *Causey v. Gray,* 250 Md. 380, 387 (1968) ; *accord, B. & O. R. R. Co. v. Chase,* 43 Md. 23, 35 (1875) ; *United States v. Groen,* 72 F. Supp. 713, 720-21 (D. D. C. 1947) *aff'd sub. nom. United States v. Martin,* 177 F. 2d 733 (D. C. Cir. 1949) and *United States v. 222.0 acres of land, etc., State of Maryland* (Assateague Island Opinion No. 1) 306 F. Supp. 138, 151 (D. Md. 1969).

Article 54, Sec. 46 has not abrogated that common law but expanded it, although the new wetlands act (Laws of 1970, ch. 241, § 2) has repealed and (Art. 66C, § 720) replaced Art. 54, Sec. 46 with a more limited right to erect shoreline improvements. The appellants, of course, come under the saving provision of that act. Art. 66C, § 731. But whether their claim is asserted under the successor or the predecessor of Sec. 46, or for that matter under the common law itself, the appellants do not have the right to interfere with the riparian rights of their neighbors, without their consent. And to the problem presented by the consent actually given in this case we shall now turn.

The appellants contend that because of the Hubbards' consent, conduct, acquiescence and failure to object or to assert title while the work progressed, they should have

been estopped from later asserting even bare legal title over the 40 foot section of the bulkhead. We think that this scattergun approach does not hit the mark. Judge Mace concluded that Hubbard had given Owen an irrevocable license because of the consent he actually gave to the construction of the bulkhead. Since the Hubbards did not cross-appeal as to the extent of the permanent easement granted in the decree and the Owens did not question it in their appeal it has become the law of this case. Moreover, we fail to see how the Owens can ask for much more than a reasonable right of access to the bulkhead, backfill and supporting structures for the purpose of maintaining the improvement as well as an unobstructed right of ingress and egress over the bulkhead to small craft attached to it. We do note, in response to certain questions raised at oral argument, that the decree would prohibit Hubbard from building onto the bulkhead without Owens' consent.

As for the estoppel argument, Hubbard's conduct was never inconsistent with the permission he gave to Owen, although we recognize that he may not have fully considered his property rights when the consent was given. Owen first wanted a harbor, and then decided that he needed a bulkhead to protect it. Hubbard obviously had no objection to this substantial improvement to the cove or his shore and was cooperative to the point of verbally allowing Owen to place substantial lateral supporting structures well within the shoreline on his own property. While Owen himself might have thought all of the bulkhead, with the exception of the lateral supports, was attached to and located along the shoreline of his property, his actions were not so obvious as to put Hubbard on notice that he was claiming more than a license. We see no grounds for granting additional rights based on estoppel beyond those which Judge Mace has already given to the appellants. Cf. *M. & C.C. v. Chesapeake,* 233 Md. 559, 578, and 581-82, 197 A. 2d 821 (1964).

*Decree affirmed. Costs to be*
*paid by the appellants.*

JOINT EXHIBIT NO. 1
No. 137, September Term, 1970

LECOMPTE CREEK

Richard C. Hubbard et al.

Riparian portion of
6ᵗʰ course as deter-
mined by trial court.

William H. Owen, et al.