611 A.2d 116

**Alton Raymond DROLSUM, et ux,**

v.

**Michael LUZURIAGA, et al.**

No. 1174, Sept. Term, 1991.

Court of Special Appeals of Maryland.

May 7, 1992.

Reconsideration Denied June 30, 1992.

Certiorari Denied Oct. 23, 1992.

Glen M. Fallin, Ellicott City, for appellants.

Thomas F. Stansfield, Westminster, for appellees.

Argued before WILNER, C.J., and ALPERT and WENNER, JJ.

ALPERT, Judge.

This case concerns the parties' rights and obligations with respect to an easement that crosses the appellants' (the Drolsums) property. The case reaches this court after a series of proceedings that culminated in a trial, upon the conclusion of which the court issued a memorandum opinion and order in the appellees' favor. This appeal ensued, and for the reasons articulated herein, we shall affirm in part, reverse in part, and remand for further proceedings.

## FACTS

In 1973, John Hannon purchased 617.744 acres of land lying on the northwest side of Arters Mill Road and on both sides of Babylon Road in Carroll County. He subdivided

the property into thirty-three lots, and sold each of them. Hannon is not a party to this action.

Several of the lots adjoin West Valley Lane (Lane), a dirt and stone right of way running from Arters Mill Road, through and along several of the lots, to Babylon Road. The segment of West Valley Lane that concerns us is that portion running through Parcel 13 and intersecting with Babylon Road. Alton and Helen Drolsum, the defendants below, and the appellants here, own Parcel 13.

Hannon first conveyed a lot abutting the right of way (the Lane) in July, 1973. Hannon deeded Parcel 21 to Irwin and Rona Desser, and the Dessers in turn conveyed the lot to David and Carol Jung Horne in 1983. Both deeds contained this language:

AND ESPECIALLY to the use in common with others of an existing private roadway leading northward to the Babylon Road and eastward to Arters Mill Road.

Next, Hannon conveyed a parcel adjoining the right of way on August 28, 1973. Hannon deeded Parcel 20 to Frank Strutz, who conveyed it to Roland and Rosalind Spurrier [1] on July 10, 1979. Parcel 20 is landlocked. Each deed conveying Parcel 20 contained the following language:

TOGETHER WITH the right and privilege to the use, in common with others, of a right-of-way fifteen feet (15') wide over an existing bridle trail leading from the western edge of the parcel of land hereby conveyed over and across all that lot or parcel of land, containing 8.252 acres, described in a Deed of John D. Hannon to Irwin Desser et al., dated July 29, 1973 and recorded among the Land Records of Carroll County ... to intersect the aforementioned roadway leading northward to the Babylon Road and eastward to Arters Mill Road.

The "aforementioned private roadway" is described as "a private right-of-way leading eastward to intersect a private roadway leading northward to the Babylon Road and east-

---

1. Roland is dead, but Rosalind is a party to these proceedings.

ward to Arters Mill Road." Obviously, this language refers to the Lane. The original deed does not explicitly grant a right to use the twenty foot wide private roadway. On June 28, 1979, however, Hannon executed a "confirmatory" deed to Strutz clarifying that Hannon intended in the original transaction to convey a right of way over "the 20 foot wide private roadway leading northward to the Babylon Road and eastward to Arters Mill Road."

On April 16, 1974, Hannon deeded Parcel 37 to Harry and Alice Kunishi. That lot lies along Arters Mill Road, and their deed contains no reference to the right of way.

On April 29, 1974, Hannon conveyed Parcel 31 to Morris and Ferol Lieberman. The deed contained the following language:

TOGETHER WITH the use in common with others entitled thereto, to an existing private roadway extending westward and northward to the Babylon Road and southward and eastward to Arters Mill Road, as the same is now or may hereafter be located.

The Liebermans conveyed the property to Albert and Amy Womanski on February 5, 1987.

Hannon conveyed Parcels 12 and 13 to the Drolsums on May 6, 1974. Their deed contained the following language:

SUBJECT to the use in common with others entitled thereto, for a period of not more than one year from the date hereof, of an existing private roadway leading northward to the Babylon Road and southward and eastward to Arters Mill Road, as the same is now located.

TOGETHER with the use in common with others entitled thereto of a 20 foot roadway easement, the centerline of which is to be located as near as can be on the westernmost boundary of Parcel Thirteen, and in no event, and at no point more than 80 feet within Parcel Thirteen; and TOGETHER with the use in common with others entitled thereto of the existing private roadway extending Southward and Eastward to Arters Mill Road as the same is now or may hereafter be located.

Later that year, the Drolsums also purchased Parcels 11 and 14, each of which abuts Babylon Road. Neither of those deeds mentions the right of way.

Subsequent deeds of lands situated along the roadway on the Babylon Road side of the subdivision refer to the right of way as "a private road, 20 feet wide, leading westward and hence northward to Babylon Road." The deeds grant the right "to the use in common with others of an existing private roadway leading eastward to Arters Mill Road and westward and thence northward to the Babylon Road."

West Valley Lane passes between the Drolsums' house and their barn. The dispute arose sometime in 1986 or 1987, when the Drolsums began obstructing access to the Lane. Other property owners began using a farm lane running behind the Drolsums' barn or going the long way around via the Lane to Arters Mill Road.

The plaintiffs in the case below owned lots that adjoined and/or were served by the Lane. In January, 1988, they filed this action in the Circuit Court for Carroll County, asking the court to determine the parties' rights and obligations with respect to the Lane, including its location, width, and maintenance. The defendants in that action, among them the Drolsums, were owners and lienholders of other property in the subdivision, and along the Lane. The plaintiffs also asked the court to enjoin the Drolsums from interfering with their use of the Lane.

The court, Burns, J. presiding, entered an interlocutory injunction on June 9, 1989, directing the Drolsums to allow several of the plaintiffs unobstructed access to the segment of the Lane running through their curtilage. The persons so protected were David and Carol Horne, Rosalind Spurrier, and their respective clientele.

On March 21, 1990, the court entered summary judgment decreeing that the Hornes own an easement to use that portion of the Lane running through the Drolsums' curtilage. The court refused to grant the same decree in Spurrier's favor.

## The Trial Court Proceedings

The Drolsums argued that those to whom Hannon conveyed the right prior to May 6, 1974, are the only people entitled to use the easement passing through their curtilage. This argument arises from the fact that their deed of that date limits to one year the roadway's use "as the same is now located," and creates thereafter a twenty foot roadway easement running along Parcel 13's western boundary, for use in common with others.

Noting that the Hornes already had won summary judgment decreeing their entitlement to use the curtilage roadway, the trial court found that the Womanskis and Spurrier, and their respective clientele, have an easement to use the existing roadway running through the Drolsums' curtilage. Each of these parties obtained their rights to the curtilage easement because their predecessors in interest obtained their deeds before May 6, 1974.

The trial court limited all other grantees to using the relocated roadway, each of these grantees having received their right to use the Lane after the May 6, 1974 deed from Hannon to the Drolsums. The deed describes the new roadway as follows:

a 20–foot roadway easement, the centerline of which is to [be] located as near as can be on the western most boundary of Parcel Thirteen and in no event, and at no point more than 80 feet within Parcel Thirteen.

The plaintiffs also took issue with several signs the Drolsums erected at the Lane's intersection with Babylon Road. The court inspected the corner, decided that the number of signs was excessive, and ordered that the Drolsums be allowed to erect one sign of reasonable size at either or both ends of the original roadway, indicating "No trespassing by unauthorized persons."

The trial court enjoined the Drolsums from attempting to limit roadway access to persons authorized to use the original easement. Apparently, the Drolsums used barriers, dismantled or removed others' efforts to make the Lane

more passable, and harassed legitimate users. The court also enjoined the Drolsums from interfering with authorized use of the relocated roadway.

The court found that the Womanskis' deed entitled them to use the original roadway through the Drolsum's curtilage, until the roadway is relocated along the property's western boundary. As we have seen, *supra,* their deed entitled them to use "an existing private roadway . . . as the same is now or may hereafter be located." The court ordered the Womanskis to use the new roadway, once it is established.

As to Spurrier's rights, the trial court found that Spurrier, too, has an easement to use the original roadway through Drolsum's curtilage. Referring to Maryland law recognizing implied easements and easements by necessity, the court concluded that without the grant of the additional right of way, Parcel 20 would remain landlocked, and the confirmatory deed clearly states the parties' original intention to transfer that right of way. Because these events preceded Hannon's May 6, 1974 conveyance to the Drolsums, which limited use to the relocated roadway, the trial court ordered that Spurrier has the right to use the original roadway.

The court, acting *sua sponte,* found an implied grant in the Nemelas' favor to use an easement through the Drolsums' curtilage. The court noted that the deed for Parcel 23 does not mention a grant of an easement to use the twenty foot wide roadway but reasoned that the Nemelas were entitled to an implied easement, as their lot would be landlocked without it. The implied grant dated from November 22, 1978, at the time of Hannon's original conveyance. Because this post-dated Hannon's May 6, 1974 conveyance to the Drolsums, which limited easement use to the relocated roadway, the trial court found that the Nemelas could use the relocated roadway, and not the curtilage roadway.

In sum, the court found that the Hornes, Spurrier, and the Womanskis, and their respective clientele, are entitled

to use the original roadway through the Drolsums' curtilage. The court also concluded that the following people and their clientele are entitled to use West Valley Lane after it is relocated to the westward boundary of the Drolsums' property: the Hornes, Spurrier, the Womanskis, the Drolsums, Mr. Peddicord (successor in title to the Permenters), the Wamplers (successors in title to the Masons), the Zurls, the Nemelas, the Luzuriagas, and the Leeches.

The trial court determined that those benefiting from the roadway's relocation should contribute to the cost. Reasoning that the Drolsums would benefit most from the relocation, the court assessed them a fifty percent share in financing the road's relocation. It assessed Spurrier and the Hornes twenty percent each and ordered the Leeches and the Nemelas to shoulder five percent each. The court specifically exempted the Luzuriagas from sharing this burden.[2]

The court ordered that the relocation should occur within one year but left to the Drolsums' discretion the new roadway's exact location, provided that it is within the area between the westernmost boundary of Parcel 13 and the present roadway. Once relocated, all parties[3] would be entitled to use West Valley Lane, and each would be responsible for its maintenance.

The Drolsums now appeal, and ask the following:

---

2. The Luzuriagas' deed contained the following language:
   By acceptance of this Deed, the within Grantees ... hereby agree that the location of the 20–foot-wide private roadway leading northward to the Babylon Road for the use in common with others, may be shifted within a distance of 300 feet of its present location as it traverses the lands of others to intersect Babylon Road, provided that the condition of any road so substituted is in as good a condition as the road presently conveyed, and provided further that no part of the cost of such relocation shall be borne by the within Grantees....

3. The parties are Spurrier, the Drolsums, the Hornes, the Womanskis, Peddicord, the Wamplers, the Zurls, the Nemelas, the Luzuriagas, and the Leeches.

I.  Whether viewing of the subject properties by the trial court through an [sic] surrogate, without prior notice to the parties or an opportunity for them to be heard concerning the surrogate's report, rendered the challenged decision procedurally defective.

II.  Whether Appellee David Horne agreed to forego his right to the private roadway easement in exchange to [sic] a right to the property-line easement.

III.  Whether an express easement upon Appellants' property over an "existing private road" now should be extinguished by application of the doctrine of comparative hardship and because of an estoppel that operates against the owners of that easement because of their acceptance of another easement that provides equally direct, convenient, and inexpensive access to the nearest public road.

IV.  Whether, if the existing private road easement is *not* to be extinguished as urged by Appellants in Part B hereof, the trial court erred in granting two concurrent easements upon Appellants' property to the owners of each of two dominant tenements.

V.  Whether the confirmatory deed to Mrs. Spurrier's predecessor in title could effectively convey a right to an easement that was not expressed or necessarily implied in the prior deed and which had been extinguished by the Hannon–Drolsum deed.

VI.  Whether, if the existing private road easement is *not* to be extinguished as urged by Appellants in Part B hereof, the trial court erred in denying Appellants' request to be permitted to erect gates at the termini of that easement.

VII.  Whether Appellants may properly be required to bear any of the expense of "relocating" the existing private road easement.

VIII.  Whether Appellants may properly be required to bear any of the expense of maintaining a new roadway over the property-line easement.

IX.  Whether the trial court's order forbidding Appellants from erecting more than two "no trespassing" signs

and prescribing precisely the language to be used in the signs infringes Appellants' free speech rights.

### I.  The Court's Visit to the Roadway

The Drolsums argue that the trial judge improperly viewed, and then improperly directed his law clerk to look at, the subject properties without giving the parties prior notice or an opportunity to be heard and that this requires us to vacate the court's April 22, 1991 order.  The Drolsums argue that they were improperly denied an opportunity to see or hear the clerk's report, to question her, and to submit evidence explaining or rebutting her report.  For reasons that we shall elaborate herein, we do not agree that the order must be vacated, although we regard some of the court's activities as inappropriate.

### a.  *The Trial Judge's Inspection*

The trial judge visited the subject property before issuing the court's written opinion and order and indicated in the opinion that he had done so.  And in the court's order denying the Drolsums' Motion to Alter or Amend Judgment and denying the Appellees' Motion to Revise Judgment, the judge signified that his law clerk visited the subject properties for the purpose of refreshing the court's recollection concerning the driveways of landowners other than the Drolsums.  In that order, the judge indicated that the court "personally inspect[ed] the subject property at the request of counsel."  Nevertheless, the record does not document any such request.

Under the circumstances, we do not think unreasonable the trial judge's visit to the disputed property.

Maryland Rule 2–515(b) provides as follows:

[T]he court, on motion of any party or on its own initiative, may order that the trier of fact view any property that is involved in the litigation or any place where a material fact in issue occurred.  The judge shall be present at and shall supervise the view and shall be the

only person permitted to make any statement to the jury during the view.

Subsection (c) provides that "[t]he parties, their attorneys, and other representatives may be present during a view." Dean Wigmore wrote that when the judge is the fact finder, the judge may appropriately view the evidence, "provided only that [the judge] observe the usual rule of fairness for a jury view, viz., that he notify the parties and allow them to attend him at the view." 4 Wigmore, Evidence, § 1169 (J.H. Chadbourne ed. 1972).

The case *Owen v. Hubbard,* 260 Md. 146, 271 A.2d 672 (1970) supports our conclusion that the judge did not behave improperly. In *Owen,* the appellants argued that the trial judge improperly viewed premises under circumstances similar to those in the case *sub judice.* The judge viewed the premises without either side being present. He stated that counsel for each side had orally consented to this, but the appellants' counsel did not recall giving consent. *Id.* at 154, 271 A.2d 672. The Court of Appeals concluded:

[The judge's] view of the premises does not appear to have been improper. He quite strongly believed he had obtained the consent of both sides, even though the better practice would have been to let the record reflect this understanding. Moreover, the abstruseness of the boundary question involved here would suggest that anyone would need to get his bearings to adequately resolve this case. His actions were imbued with the "common sense" of which Dean Wigmore speaks in his discussion on views of the premises by the trial judge.

Consonant with the reasoning expressed in *Owen,* we conclude that the trial court's actions were not improper. The judge's order denying the Drolsums' Motion to Alter or Amend Judgment indicates that "the Court did personally inspect the subject property at the request of counsel." We cannot affirmatively say that the request was *not* made and note that in the proceedings below the Drolsums' counsel are different from their counsel in these proceedings, and this could account for some of the confusion on this matter.

Although this request did not find its way into the record, we nevertheless are persuaded that the judge, at a minimum, believed that he had the consent of each side. While the trial judge was justified in investigating the properties to determine which of the parcels would gain the most benefit from relocating the easement and to determine the fair allocation of the project's cost, it would have been the better practice to place on the record a waiver by counsel for the parties of their right to be present during a view of the subject property. *See* M.R. 2-515(c).

### The Law Clerk's Inspection

■ We do not view in the same light the law clerk's visit to the properties at the court's request.

As we have seen, *supra,* Maryland Rule 2-515(b) requires that a judge be present at any viewing. Because the able and experienced judge was not present, the law clerk's inspection was error.

Moreover, the judge's reliance upon the clerk's observations could be construed as an impermissible independent investigation. In *Legal Aid Bureau, Inc. v. Bishop's Garth Assocs. Ltd. Partnership,* 75 Md.App. 214, 223-24, 540 A.2d 1175 (1988), a case in which this court determined that the trial judge erred as a matter of law to the extent that he considered the jury foreman's remarks in determining whether one of the party's comments warranted sanctions, we said that, "A judge may not conduct 'any kind of independent investigation' into the facts that he or she must ultimately determine." *See also Wiseman v. State,* 72 Md.App. 605, 609, 531 A.2d 1311 (1987) (judge's personal knowledge of disputed evidentiary facts requires recusal).

■ The fact finder's role, whether judge or jury, is to receive the facts and arguments as framed by counsel. The trier of fact must make its decisions based upon material presented in court, within rules of evidence and procedure. In jury trials, efforts are made to exclude outside influences and prejudicial evidence so that they do not affect the jury's judgment. These procedures are not used when a judge

sits as the fact finder because of the presumption that a judge is able to exclude outside influences from his or her decision-making. Neither the jury nor a judge, in his or her capacity as trier of fact, is allowed to conduct an independent inquiry into the case.

The appellants argue that the parties have no way of knowing the extent to which the judge relied upon the law clerk's *ex parte* report in making his decision. In the order on the Appellants' Motion to Alter or Amend Judgment, the judge indicated that he used the information merely to "refresh the Court's recollection as to the location along the road in question of driveways of landowners other than the Drolsums, for the purpose of assessing relocation costs."

The record from this case is hundreds of pages long and includes deeds, plats, diagrams, and photographs. The judge's viewing of the property also was properly part of the evidence. Given this, it is arguable that the law clerk's viewing could add but little to the accumulated evidence, especially considering the limited purpose to which the trial court applied the evidence admitted in error. Yet we do not know the extent to which the error may have affected the decision of relocation costs. Thus, we must reverse and remand for a new trial on the issue of "relocation costs."

## II. The Hornes' Entitlement

The Drolsums argue that David Horne agreed to exchange his right to use the curtilage easement for the right to use the property line easement. Although they do not articulate a conclusion, presumably their aim is to show that the trial court could not properly determine that the Hornes are entitled to use both the curtilage easement and the property line easement.

The April 22, 1991 order discusses two roadways. It expressly confirms that the Hornes, Spurrier, and the Womanskis, are entitled to use the curtilage easement. The order specifies that the Womanskis must use the property line easement (once constructed) but does not express a similar limit for the Hornes and the Spurriers.

The appellee's arguments render moot the Drolsums' concerns. The appellees deny that the Hornes agreed to release the curtilage easement but concede that the order does not contemplate the Hornes' continued use of the curtilage easement after the property line easement is constructed. Indeed, their brief expresses the view that the order does not create a second easement, but relocates the existing easement from the Drolsums' curtilage to their property line.

We agree with this assessment. The order indicates that West Valley Lane is to be relocated from its existing location running through the Drolsums' curtilage to a location of their choosing. When all matters concerning the Lane's relocation have been resolved, there will be but one roadway, and upon its completion the curtilage easement will be extinguished.

### III.  Extinguishing the Existing Easement

The Drolsums argue that the express easement through their curtilage should be extinguished by application of the doctrine of comparative hardship, and estoppel. In view of our finding, *supra*, that the appellees do not contest the extinguishment of the curtilage easement, and that the order does not contemplate more than one easement, we need not address these arguments individually. Upon remand, the trial court shall include in any new order a provision explicitly extinguishing the curtilage easement in favor of the new easement, upon its construction.

### IV.  Concurrent Easements

The Drolsums argue that the trial court created from thin air the Hornes' and Spurrier's right to two easements and that these two parties are prepared to accept entitlement to each easement. Our conclusions in sections II and III, *supra*, obviate any necessity to address this argument. We expressly hold, however, that our conclusions in those sections apply with equal force to Spurrier's rights in the easement: Spurrier is entitled to use the curtilage roadway

until the property line roadway is constructed, at which time she may use the new roadway, and her interest in using the curtilage easement is extinguished. Upon remand, the trial court's order must reflect this.

### V. The Confirmatory Deed

The Drolsums argue that the confirmatory deed from Hannon to Strutz cannot confirm the right to an easement upon the curtilage roadway. They contend that, as Strutz' successor in interest, Spurrier, is not entitled to use the Lane and is allowed only to use a fifteen foot right of way over an existing bridle trail to West Valley Lane.

The trial court concluded that Spurrier has an unobstructed right to use the curtilage easement, and we cannot say that this conclusion was clearly erroneous. We shall explain.

■ The original deed from Hannon to Strutz granted an easement across what is now the Hornes' land and intersects with the Lane, described in that deed as "the aforesaid roadway leading northward to Babylon Road and eastward to Arters Mill Road." The deed also provides as follows: "and especially to the use in common with others of the aforementioned right of way."

Although ambiguous, this deed provision reasonably could be interpreted to refer to the Lane, thereby granting Strutz access to the curtilage roadway. The confirmatory deed certainly clarifies the ambiguity, but that deed is not necessary to our conclusion that the original deed effectively conveys to Strutz the Lane easement. Because Spurrier is Strutz's successor in interest, she is entitled to Strutz's interest. *See* Md.Real Prop.Code Ann. § 2–114(a) (1988) (all of the grantor's right, title, and interest pass to the grantee upon transfer); *see also Campeggi v. Wakefield,* 157 Md. 229, 237, 145 A. 546 (1929) (that language applies to private as well as to public streets).

### VI.   The Gates

The Drolsums argue that the trial court erred in denying their request to erect gates at the curtilage easement's termini.  They argue that the court should allow them some means to require unauthorized intruders to stop long enough to read their posted warnings against trespassing.

In view of our finding in sections II and III, *supra,* we think it unnecessary to reach this question.  The easement across the curtilage will be extinguished upon its relocation to the property line, and this renders moot any argument about the Drolsums' need to construct gates across it.

■  The grant of an easement across a servient tenement owner's lands does not imply that the grantor may not erect gates.  *See Everdell v. Carroll,* 25 Md.App. 458, 464, 336 A.2d 145 (1975) (quoting *Baker v. Frick,* 45 Md. 337 (1876)).  In *Bishields v. Campbell,* 200 Md. 622, 624–25, 91 A.2d 922 (1952) (citations omitted), the Court of Appeals indicated that:

> [A] right of way is merely a right of passage and the owner of land is entitled to use it for any purpose that does not unreasonably interfere with the use of the easement.  Hence, it is held in this State that, in the absence of an agreement or surrounding circumstances to the contrary, the owner of the servient estate has the right to maintain gates on a right of way at the points where the way begins and terminates.  Of course, if a grant, construed in connection with the surrounding circumstances, shows an intention that no gate shall be erected, such a showing of intention is controlling.  It is equally true that the fact that a gate was standing at the time of a grant is a circumstance that strengthens the presumption that the parties contemplated that a gate might thereafter be maintained.

*See also Maddran v. Mullendore,* 206 Md. 291, 297, 111 A.2d 608 (1955) ("the owner of a servient tenement cannot close or obstruct the easement against those who are enti-

tled to its use in such manner as to prevent or interfere with their reasonable enjoyment.").

The trial court's order is consistent with these principles: it enjoined the Drolsums "from interfering in any manner with the use by authorized persons of the original or relocated right-of-way through their property." The court could reasonably conclude that gates at either end of the Lane as it presently crosses the Drolsum's property unreasonably interfered with the dominant tenement owners' reasonable enjoyment of their easement. Moreover, although the deeds do not clarify the parties' intent in this matter, the fact that there were no gates when the easements were created lends weight to the argument that the parties did not contemplate their subsequent erection.

## VII. Financing Relocation of the Road

The Drolsums argue that they should be relieved of the financial burden associated with relocating the roadway from their curtilage to the property line. They contend that they will gain virtually nothing from the relocation because they do not need to use the property line easement, and they characterize as "sheer blackmail" the idea that they will benefit from being relieved of "having any or all of their neighbors driving by their residence at all hours."

As we saw earlier, the trial court concluded that the Drolsums would benefit most from the road's relocation and allocated to them fifty percent of the cost of building the new road. The court's opinion states:

> We find the Drolsums to benefit most from the relocation. The present roadway runs between the Drolsum's house and barn, relatively close to the house. Mrs. Drolsum testified that use of the road by so many persons now had become particularly bothersome, especially when people come through in the morning to go to work. She described it as "a lot of commotion around the family," "really unpleasant," and said they "find the traffic unbearable." Testimony from other witnesses and a recent trespassing case heard by this Court reveal how

the Drolsums have become obsessed with checking out every person who uses the roadway to see if they are authorized. The sheer number of signs posted by the Drolsums demonstrates their desire to limit use of the original roadway, yet this order expands by two households those authorized to use it. Clearly, the Drolsums will have no peace until the roadway is relocated. We shall assess the Drolsums for Fifty percent (50%) of the cost of relocation of the roadway.

While we have no difficulty with the trial judge's finding that the Drolsums *benefitted* the most from relocation, we believe that *use* is an important factor in assessing the degree of benefit and, in turn, in allocating the cost of relocation. We explain.

Counsel have not cited, nor has our extensive research revealed, any authorities dealing with the allocation or apportionment of the cost of relocating an easement, but this unique case seems to involve more than relocating the easement, for in the relocation process an entirely new road may be constructed. In that sense, not only is the easement being relocated, it is being repaired. Thus, we shall borrow certain legal principles heretofore applied only in cases involving apportionment of the repair and maintenance of easements.

According to the Restatement of the Law, Property,

[i]n the case of an easement created by conveyance, the existence and the extent of any privilege and any duty of the owner of the easement to maintain, repair and improve the condition of the servient tenement for the purpose of increasing the effective uses of the easement or protecting the interests of the possessor of the servient tenement are determined by the conveyance.

*Restatement, Law of Property* § 485 *Maintenance and Repair.* In the event that the conveyance creating the easement is silent or "is so indefinite as not clearly to provide for a duty to repair, the inference to be drawn is

that such duty as exists is upon the owner of the easement." *Restatement, Law of Property* § 485, comment b.

In the absence of an agreement, the owner of the servient tenement is under no duty to maintain or repair it, but rather it is the duty of the owner of the easement to keep it in repair. 25 Am.Jur.2d § 85. The few Maryland cases on this subject hold that an easement owner has a *right* to repair, maintain, and improve the easement. We believe that no Maryland case has actually considered the *duty* of an owner to keep an easement in repair. *See Wagner v. Doehring,* 315 Md. 97, 104, 553 A.2d 684 (1989) (grant of right of way entitles holder to "maintain, improve, or repair the way to serve its purpose"); *Tong v. Feldman,* 152 Md. 398, 402, 136 A. 822 (1927) (dominant tenement owner may enter, at reasonable times, to make proper repairs); *Fedder v. Component Structures Corp.,* 23 Md.App. 375, 381, 329 A.2d 56 (1974) (owner of right of way may prepare, maintain, improve, or repair way).

We also observe that the Maryland appellate courts have not decided a case involving a dispute over distribution of the burden of maintenance and repair as between the owners of both the dominant and servient tenements. In other jurisdictions, "where an easement is used by the owners of both tenements, an equitable distribution of the burden of maintenance and repair must be made." 28 C.J.S. *Easements* § 94(a) (1941 & Supp.1991). It seems to be the undisputed general rule that:

> Where a private road is used in common by the owner of land across which such road runs and by a person who has an easement of way over it, the burden of reasonable repairs must be distributed between them in proportion as nearly as possible to the relative use of the road.

25 Am.Jur.2d *Easements and Licenses* § 85 (1966 & Supp. 1991). *See also Barnard v. Gaumer,* 146 Colo. 409, 361 P.2d 778 (1961); *Borgel v. Hoffman,* 219 Pa.Super. 260, 280 A.2d 608 (1971); *Lindhorst v. Wright,* 616 P.2d 450 (Okl. App.1980); *Triplett v. Beuckman,* 40 Ill.App.3d 379, 352 N.E.2d 458 (1976).

With these principles in mind, we direct that, upon re-
mand, the trial judge, in effecting an equitable distribution
of the burden of relocation, shall factor in the respective
future uses of the relocated easement in considering the
benefit to the owners of the servient and dominant tene-
ments. He shall consider *use* and *benefit* as a unitary fact.
While the Drolsums may, indeed, *benefit* the most from the
relocation by having traffic removed from such close prox-
imity to their house, they may make the least use of the
relocated easement.[4] The dominant owners, in different
proportions perhaps, will also benefit from the location.
That benefit comes from their ability to use the relocated
way and, to a great extent, the amount of benefit they will
derive will depend on the quality of the relocated roadway.

Notwithstanding a valiant effort on the part of the trial
court and counsel to bring this matter to a just resolution,
we believe that several factors must be considered on
remand by the trier of fact:

1. The respective use/benefits of relocation as be-
tween the Drolsums, Luzuriagas, Hornes, Spurrier, the
Nemelas, and the Leeches. (See paragraph A, page 10 of
the trial court's opinion.)

2. Equitable distribution of the costs of relocation
based on the respective use/benefits.

3. Whether the cost of relocation includes more than
providing a roadway similar to the curtilage roadway and,
if so, who should bear the cost of that improved roadway,
again based on the respective use/benefits.

The final order in this case did not prescribe the cost and
nature of the roadway to be constructed on the property
line easement, as this is something that the authorized
users must agree upon. But under that order, if the

---

4. Merely because the Drolsums are entitled to use the easement does
not mean that they will use it. Once extinguished as an easement, the
curtilage road no doubt will serve as their driveway; the boundary
line right of way is not necessary as ingress or egress to their
property. It is possible, though, that they will use the new roadway as
a shortcut to Arters Mill Road or for some other purpose.

Drolsums do not construct some kind of roadway along the easement within a specified period, the appellees will have the right to do so and to assess costs according to the trial court's determination. This order provided the Drolsums an incentive to act promptly to construct the new road or to be assessed a portion of the costs of the appellee's choice of road surface. These incentives were the trial court's attempt to effect a final resolution of the easement issue between these parties. Casting aside the erroneous allocation formula mentioned earlier, we believe that Judge Burns has fashioned a sensible remedy. He may, but is not bound to, follow a similar formula upon remand.

### VIII.  Maintenance Expenses

The Drolsums contend that they should not be required to bear any of the expense of maintaining the new property line roadway. The trial court set their share at ten percent.

■ The trial court based its allocation of the maintenance expenses upon the Drolsums' right to use the property line easement. The opinion indicates that "[a]fter relocation of the roadway across the property of the Drolsums is complete, we find all parties entitled to the use of West Valley Lane (namely, the Drolsums, Hornes, Mrs. Spurrier, Womanskis, Mr. Peddicord, Wamplers, Zurls, Nemelas, Luzuriagas, and Leeches) to be equally responsible for its maintenance." The trial court apparently found it expedient to assume that the Drolsums would use the easement, and to assess costs accordingly. With regard to this issue, we believe that the law is clear—the cost of maintenance should be distributed among all users in proportions that closely approximate their usage. We repeat, however, that the Drolsums' entitlement to use the easement does not mean that they will use it and remand this issue for further factual determination.

### IX.  The "No Trespassing" Signs

The Drolsums argue that the order forbidding them from erecting more than two "no trespassing" signs, and pre-

scribing the language that may be used on the signs, infringes upon their free speech rights. Consequently, they contend, the trial court wrongfully ordered them to remove a sign accusing one of their neighbors of stealing wood from their woodpile.

The signs in issue read as follows:

PLEASE MRS. HORNE
STOP REMOVING
WOOD FROM OUR
WOODPILE AND
DO NOT
CARRY OFF OUR
DRIVEWAY STONE

The April 22 Order contains the following language:

ORDERED, that Defendants Alton R. Drolsum and Helen N. Drolsum may display one sign, and only one sign, of reasonable size at either or both ends of the roadway through their curtilage, and that such sign(s) may read "No trespassing by unauthorized person"; ...

We consider inappropriate the trial court's action in ordering the signs' removal. Signs imputing a named person's dishonesty, fraud, or cheating are not constitutionally protected. *See* 50 Am.Jur.2d, *Libel and Slander,* § 74. Nevertheless, the defamatory nature of the language used in the signs has not been adjudicated. Until found defamatory, the prohibition on any sign other than the one prescribed in the Order acts as a restraint on the Drolsum's speech. Theoretically, the Drolsums could be held in contempt of the trial court's Order if they erected at the corner of the Lane and Babylon Road signs supporting political candidates.

We reverse that portion of the trial court's Order pertaining to the number and language of the signs the Drolsums may post on their property. The court legitimately may restrict only those signs pertaining to the easement's use.

24

JUDGMENT AFFIRMED IN PART; REVERSED IN PART; AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY AMONG ALL OF THE PARTIES.